No. 46.—Alexander W. Wylly *et al.* plaintiffs in error, *vs.* S. Z. Collins & Co. defendants in error.

[1.] Trust estates are liable to pay out of their income for goods or services furnished or rendered, and such as are necessary and proper.

[2.] A creditor is not bound to ascertain whether the trustee is or is not in arrears to the trust estate.

[3.] The rule in South Carolina, which denies relief to creditors, where the executor or other trustee is in arrears to the trust estate, ought not to be adopted in this State, where no returns are made by trustees, other than executors, administrators and guardians, of their receipts and disbursements.

[4.] Future income may be applied to past indebtedness.

[5.] A wife and children, who have separate property settled upon them, are not bound to support the husband and father: though, owing to his insolvency, they may be bound to support themselves.

[6.] A married woman is a *feme sole*, as to her separate estate, unless controlled by the settlement; and if so restricted, she is a *feme sole sub modo only*, and the mode of disposition prescribed in the instrument must be followed.

[7.] The doctrine of the *Bible* and of the *Common Law*, that husband and wife are *one*, superseded by the introduction of a new principle from the *Civil* Law, that they are distinct persons, with distinct property, and distinct powers over it.

[8.] The registry of the deed of settlement, accompanied by the management of the trust property by the husband, is, as to third persons, evidence of his agency for the trust property.

[9.] Although the husband, as such, has no right to control the separate estate of his wife, yet, he may, like any other person, do a ministerial act, such as purchasing goods for the trust estate.

[10.] Taking the note of the manager of the trust estate, *in settlement* of the account for goods debited to the manager, individually, but which went to the use of the *cestui que trusts*, does not relieve the trust estate from liability to pay out of its income, where it does not appear that exclusive credit was given to the agent.

[11.] One simple contract does not merge or extinguish another.

[12.] A bill, acceptance or promissory note, either of the debtor or a third person, is not a payment or extinguishment of a debt, unless accepted as such.

[13.] The circumstance of the note or bill being given by an agent of the principal debtor, cannot vary the question.

[14.] If the written promise of the principal debtor does not discharge the debt—*a fortiori*—the note of the agent can have no higher efficacy.

[15.] Although the Statute of Limitations applies to constructive trusts, yet it is not available where the legal remedy against the agent has not been barred. The Statute does not begin to run in favor of the trust estate, until a return of *nulla bona* against the agent or his insolvency be legally ascertained. The practice of exhausting the legal remedy against such agent, before proceeding in Equity against the trust estate, is in furtherance of justice.

In Equity, in McIntosh Superior Court, April Term, 1850. Tried before Judge H. R. JACKSON.

The following statement of facts in this cause was agreed upon by counsel for both parties:

Thomas Spalding, on the first day of January, 1833, executed

a deed to certain persons, conveying two tracts of land and seventy negroes, to be held in trust "for the sole and separate use and benefit of his daughter, Elizabeth Wylly, during her life, and after her death," to her children. The deed alleged, that it was made for the purpose of providing for the maintenance of Mrs. W. and the education of her children. The trustees were authorized to give the management of the property to whomsoever, in their discretion, they thought best qualified. The deed was recorded in the County of McIntosh, (where all the parties thereto, the grantor, *cestui que trusts*, trustees and the complainants below then resided, and still reside.) William Cook and Charles Spalding, two of the trustees, accepted the trust, but never made any appointment of a manager, nor authorized any one to contract debts upon its authority. The trustees never intermeddled with the trust property—the same having been delivered by the grantor to the said *cestui que trusts*. Alexander W. Wylly, the husband and father, planted the land with the trust slaves, sold the crops, and received all the rents, issues and profits of said trust estate and the proceeds of the crops, from the time the deed was made until this suit was brought. Wylly contracted a debt with defendants in error (complainants below) for various articles, furnished in 1840 and 1841, charged in an exhibit to the bill. The account was charged on the books of complainants to Wylly individually—he not professing to act as agent or manager of the trust estate. The articles sold were used by Wylly and his family, (the *cestui que trusts*,) and partly by the trust slaves, and for the use of the plantation. Wylly promised complainants to pay for these articles out of the crops which he should thereafter make. On 21st January, 1841, Wylly gave to complainants his individual negotiable note in settlement of said account, and complainant gave him a receipt for the account; upon which note, judgment has been recovered against him, individually, at December Term, 1842, and a *fi. fa.* issued and returned, with an entry of *nulla bona*. In May, 1844, Wylly sold complainants a carriage for $165, most of which was to be credited on this debt. No notice was given to the trustees of this debt, or of the intention of

looking to the trust estate, until complainants filed a bill in October, 1848, seeking to subject the trust property. It was agreed that there were various other suits pending, of the same character, against the trustees; also, that Wylly was utterly insolvent.

The Jury found a special verdict, finding the above facts, and submitting the questions of law arising therefrom to the Court.

After argument heard, the Court held, that the complainants were entitled to recover, upon the facts found. To this decision, error has been assigned in this—

1st. That His Honor erred in deciding that the trust estate had ever, under the circumstances of the case, been liable to the demands of complainants.

2d. That His Honor erred in deciding that the complainants had not discharged the trust estate by debiting Alexander W. Wylly, individually, and by subsequently taking his individual note, giving a receipt in settlement, and suing upon said note.

3d. That he erred in deciding that the claim was not barred by the Statute of Limitations.

Law and Charlton, for plaintiffs in error.

Points made by plaintiffs in error—

1. The trust estate sought to be charged, was never, under the circumstances of the case, liable to complainants, the defendants in error.

The credit was given to A. W. Wylly exclusively—he alone was to be liable—all the facts of the case shew this. Even if he had been trustee, he could not bind the trust estate. *Story on Agency,* §280. *Story on Notes,* §63. 1 *Bailey's Equity,* 159 *to* 162.

In Equity, an exception prevails—but three things must combine to create this equitable exception. 1. The necessity of the debt to the trust estate. 2. The indebtedness of the trust estate to the trustee. 3. The insolvency of the trustee. Where these combine, the creditor is subrogated to the rights of the trustee. *Bailey's Eq.* 162 *to* 164. *Ibid,* 290. *Ibid,* 317, 318. 1 *Richardson's Eq.* 263, '4. 2 *Strobhart's Eq. Rep.* 235, '6. See, also,

1 *Hill's Ch. Rep.* 228, 231, 232, 233, 235, '6, 240, as to right of husband to bind.

2. If the trust estate was ever liable to defendants in error, it has been discharged by the acts of said defendants in error. They have made their election, by debiting A. W. Wylly, individually, by taking his note, and by suing him, and by their other acts. They are bound by such election. *Story on Agency,* §§279, 288, 291.  17 *Eng. Com. Law Rep.* 337.  15 *East.* 62. 14 *Connecticut Rep.* 502, 8.  10 *Wendell,* 271.  1 *Bailey,* 289.

3. The Statute of Limitations, or the equitable principle analagous thereto, has barred this claim against the trust estate. *Angel on Limitations,* pp. 229, 291, 293.  12 *Wheaton's Rep.* 565. 10 *Peters' Rep.* 223.  2 *Story's Eq. Jur.* §1520.  1 *Sch. & Lef.* 413, 429.  1 *Ball & Beat.* 156, 166.  6 *John. Chan. Rep.* 291, '2. 6 *Geo. Rep.* 21.  8 *Geo. Rep.* 108.

HARDEN & LAWTON and HENRY & WARD, for defendants in error, presented the following propositions on behalf of defendants in error :

1st. That trust estates are ordinarily liable for goods, services, and supplies furnished them, or which go to their use.  4 *Dess.* 19, 591.  1 *McCord's Ch. Rep.* 267.  2 *McCord's Ch. Rep.* 105. *R. M. Charlton's Rep.* 376.  3 *Kelly,* 383.  2 *Story's Eq. Jur.* §1400.

2d. That taking the note of Wylly, (with a receipt given, as in this case, calling it a *settlement,*) did not relieve the trust estate from liability.  *Story on Promissory Notes,* §§104, 105, 117, 404, 438.  5 *Johns.* 68.  8 *Johns.* 389.  7 *Hill,* 128.  2 *Richardson,* 241.  6 *Ga. Rep.* 171.  *Webster's Dict.* (word *settle.*)  2 *Bouvier's Law Dict.* 394.  1 *Kelly,* 287, 288.  3 *Kelly,* 397.  4 *Dess.* 19, 591.

3d. That Mrs. Wylly, the *cestui que trust* for life, had the power and the right to incumber the profits of the trust estate, and to do this through her husband.  1 *Kelly,* 389.  6 *Ga. Rep.* 20. *Story on Agency,* 7, 8.

4th. That the receipt and use of the goods raised a consid-

eration for an implied promise by Mrs. Wylly or her trustees, to pay for the goods out of the trust estate, inasmuch as such a promise would have been implied, at law, had she been *sui juris*, so as to bind her personally.  14 *Johns.* 188.  10 *Johns.* 244, and cases cited, with Equity cases referred to above.

5th.  That if Wylly was not the agent of the trust estate, with power to *bind* it, then, on his furnishing it with necessaries, the estate became his debtor, and he being insolvent, and being the debtor of the defendants in error, and having promised to pay them out of the income of the trust estate, they should stand in his place and be subrogated to his rights, especially as he was not bound, under the circumstances of the case, to support his wife and children.  2 *Kent's Com.* 190, 191.  9 *Vesey*, 286.  14 *Vesey*, 499.  4 *Johns. Ch. Rep.* 100, 104, 105.  2 *Barb. Ch. Rep.* 375.  1 *Maddock's Rep.* 59.  *Bailey's Eq. Rep.* 311.  1 *Hill's Ch. Rep.* 234.

6th.  That the record shows that Wylly was a *general* agent, and that exclusive credit was not given to him individually, as he promised to pay out of the crops to be made with the trust property, and the defendants in error ought to be paid, especially as the trustees did not act.  *Story on Agency*, 115 *to* 118, 451.  14 *Vesey*, 501.

7th.  That defendants in error are entitled to recover, whether Wylly did or did not disclose his agency or make known his principal.  *Story on Agency*, 453.

8th.  That under the peculiar circumstances of this case, a Court of Equity might well decree that Wylly was, *quoad hoc*, a trustee himself.  2 *Story's Eq. Jur.* §1059.  *Willis on Trustees*, 32, 33, 70.

9th.  That upon general principles of equity, even if it be clear that Wylly mismanaged the estate, still defendants in error are not responsible for such mismanagement, and if loss is to ensue to either party, they should not suffer for having given credit to an estate on the promise of a manager, held out to the world as such manager, by constructive notice from the registry and actual appointment by the grantor.  But that the record dis-

closes no mismanagement—at least no waste of the income by Wylly.

10th. That neither the Statute of Limitations, nor the rules of Courts of Equity in analogy thereto, or for the discouragement of *laches* and stale demands, have any application to this case:

*First.* Because, taking the whole joint answer of all the defendants together, a debt of some sort is admitted, on the record, to be due, and the Statute is avoided, as to that debt, by the admission itself. 20 *Johns. Reps.* 576.

*Secondly.* Courts of Equity act in obedience to the Statute *only when they have concurrent jurisdiction with the Courts of Law* and the legal remedy has run out. 2 *Story's Eq. Jur.* §1520. *Kane vs. Bloodgood,* 7 *Johns. Ch.* 114 *to* 118. 7 *Ga. Rep.* 159, 160. 6 *Johns. Ch. Rep.* 289.

In all other cases, (except, perhaps, in some cases of *direct* trusts,) they act either upon their own rule of *twenty years,* or, according to the circumstances of each case, they discourage *laches* within or beyond twenty years, that being the longest period within which they usually give relief. 2 *Scho. & Lef.* 607, 630, 631, 632. 15 *Peters,* 272. 1 *Howard,* 189. 2 *Barbour,* 595. 2 *Story's Eq. Jur.* §1520, *and note* 3.

*Thirdly.* The case at bar is one of *exclusive Equity jurisdiction.*

*Fourthly.* The case under consideration is not only that of a trust cognizable in Equity, but it is the case of a *direct trust.* If it is the case of a trust at all, the Statute of Limitations has no application to it, unless there is a concurrent jurisdiction at law. 7 *Johns. Ch. Rep.* 124 *to* 128. 20 *Johns.* 583 '4. 7 *Ga. Rep.* 160, 161.

*Fifthly.* The defendants in error have not been guilty of *laches* in the prosecution of their equitable demand.

*By the Court.*—LUMPKIN, J. delivering the opinion.

A bill was filed in the Superior Court of McIntosh County, by S. Z. Collins & Co. against Alexander W. Wylly and Elizabeth, his wife, William Cook and Charles Spalding, trustees, for the purpose of subjecting the income of the trust estate of Mrs. Eliza-

beth Wylly to the payment of a debt due the complainants for articles furnished to the trust estate, and to the *cestui que trusts*.

By the deed which gave existence to this estate, the grantor, Mr. Thomas Spalding, declared that his sole purpose in conveying the land and negroes, mentioned in the instrument, was for the maintenance of his daughter, Mrs. Wylly, and for the education of her children; the whole property to be for the sole and separate use of his daughter during her life, and after her *death*, then for the benefit of such child or children as might be living at the time of her decease. He gave to the trustees the right to appoint an agent to manage the property. The bill charges, that Alexander W. Wylly was the agent thus appointed. The answer admits that the trustees accepted the trust, but never afterwards interfered with the estate. It denies the appointment of Wylly, but admits that he, together with his family, the *cestui que trusts*, were in possession of the land and negroes from the 1st of January, 1833, when the deed was executed, down to 1848, when the bill was filed; that Wylly planted the land with the trust slaves, sold the crops and received the whole income during this entire period. Wylly contracted this debt with the complainants, who were merchants. The account was debited on the books of the firm to him, individually, and was for articles furnished during the year 1840, which the decree finds were charged at reasonable rates, and were used and consumed by Wylly and his family, and partly by the trust slaves and on the plantation. I would remark here, that the wife and children are not bound to support the husband and father, though, owing to his insolvency, they may be bound to support themselves out of the separate property set apart for that purpose. The Court below offered to the parties to have this point referred, if they thought proper, and to strike from the account all the items which were used by Wylly, he being alone responsible for them. ·

Wylly promised to pay complainants' debt out of the crops which he should thereafter make. In 1841, he gave his individual negotiable note to the complainants, in settlement of the account, and a receipt was given to him for the same, on settlement. Shortly thereafter, suit was instituted on this note, and a judgment

rendered in December, 1842, for principal, interest and cost. In 1844, the proceeds of a carriage, sold by the defendant to the plaintiffs, was credited on the execution, and, in 1848, a return of *nulla bona* was made on the *fi. fa.* by the Sheriff of McIntosh County.

No notice was given by the creditor to the trustees of the debt, or of their intention to hold the trust estate liable, until the filing of the bill in October, 1848. It is agreed that there are various claims of a similar character outstanding against the trust estate, on some of which proceedings have been instituted. Wylly is insolvent, and availed himself of the benefit of the Honest Debtor's Act before this bill was filed.

The bill alleges, that the trust estate, for whose benefit these goods were supplied, is ample, from the rents, issues and profits, to support the *cestui que trusts,* to educate the children and to pay the debts; and prays that the *surplus* only—after the objects of the donor's bounty are fully provided for—may be set apart for the satisfaction of complainants' demand.

Two questions are made by this record for the consideration of the Court—

1st. What were the original rights of the complainants in the Court below, as against this trust estate, for the goods which they sold and delivered?

2d. If these complainants had any rights against the trust estate, have these rights been lost by any acts of commission or omission on their part?

1. What were the rights of these complainants against this trust estate?

[1.] I take it to be well settled, that a trust estate is liable for articles furnished for its benefit, and which are necessary and proper for its support—due regard being had to the condition and circumstances of the *cestui que trusts.*

This principle has been repeatedly adjudicated in South Carolina. In *Carter vs. Everleigh and Wife,* (4 *Dess. Eq. Rep.* 19,) the Court of Appeals unanimously held, that where the *husband,* acting as *manager* of a separate trust estate of his wife, purchased a saw-gin for the use of the trust estate, of which it had the

benefit, the trust estate was liable to pay for the saw-gin, *although the husband gave his own note for the gin, and the vendor, believing him the owner of the property, had sued the note and pursued the husband to insolvency.* This is a leading case in the Courts of our sister State, and has never been overruled. On the contrary, it was cited as law by Chancellor *Harper,* as late as 1833, in *Magwood & Patterson vs. Johnston and others,* 1 *Hill's Ch. Rep.* 228. It is identical, in every particular, with the case before us.

In *James vs. Magrant,* (4 *Dess. Eq. Rep.* 591,) a factor had furnished supplies to a trust estate, and the Court, conceiving that the trust property had received the benefit, re-affirmed the decision in the foregoing case, and held the trust estate bound to make compensation ; and that, too, notwithstanding the *husband,* who was insolvent, *had given his note for the articles.*

*Montgomery vs. Everleigh and others,* (1 *McCord's Ch. Rep.* 267,) was a bill filed to make the trust estate liable for a quantity of corn, alleged to have been supplied for the subsistence of the slaves of the trust estate. The complainant, who was the indorser of the note of hand given for the corn, had been obliged to pay it, and this proceeding against the trust estate was for re-imbursement. Mrs. Ann Everleigh, the *cestui que trust for life,* had hired out the slaves and plantation by the year, at the time the corn was bought, to her son Thomas. No notice of that fact, however, had been given to the world, or that he was to be looked to for supplies furnished the trust estate. It was in proof that Thomas Everleigh had no property of his own, and that for a number of years he had acted as the general agent of his mother, and transacted all the business in relation to the trust estate.

Chancellor *Dessausure,* under the circumstances, did not hesitate to hold the trust estate liable for the debt. He said it would be a fraud upon the public to protect a trust estate from such a demand. He referred to the cases of *Carter and Everleigh* and *James and Magrant,* where it had been settled that trust estates were responsible for debts contracted for their use, and remarked that it would be destructive to trust estates if they were not so liable, as it would take away all credit when the slaves

might be perishing for want of food, or dying for want of medical aid.

*Douglas vs. The Executor of Fraser,* (2 *McCord's Ch. Rep.* 105,) was that of a debt partly owing by the testator in his lifetime, and in part contracted by the executor for goods, &c. for which the executor had given his own note. The executor was insolvent, and the bill was filed against him to subject the estate in his hands to the payment of the debt. The Chancellor ruled, that the estate was liable, and, upon appeal, the decree was affirmed—Judge *Nott* observing that the mere circumstance of the executor having liquidated the demand, could not exempt the estate from the payment of a debt otherwise chargeable upon it.

In 1832, Dr. Habersham filed his bill against the estate of Gen. *Jacob* Read, to recover for medical services performed for negroes belonging to the estate of *Gen.* Read, on the faith of the estate, and at the instance of the executor thereof, who had since died insolvent. Our learned brother, Law—now of counsel for the plaintiffs in error—the boast of the bar—who then presided on the bench of the Eastern Circuit, with such distinguished honor to himself and usefulness to his country, leaving on record the deeply engraven impressions of a genius which still burns with a pure and bright flame, throwing far and wide its benificent beams, to guide and cheer us—examined this doctrine, particularly in reference to this description of trust property, consisting in plantation and negroes, and requiring, as necessary to their utility, and even existence, supplies of utensils, food, clothing and medical attendance, and came to the conclusion that, upon principle, as well as the authority of adjudicated cases, these Carolina decisions, which he cites with approbation, are perfectly just and equitable, and in accordance with sound policy. *R. M. Charlton's Rep.* 376.

[2.] While the general rule, established by these precedents seems to be admitted, it is contended that *usually* the creditor of a *trustee* has no right to resort to the trust estate for the payment of his debt, and that a creditor thus dealing has no right to look to the trust estate for remuneration, unless the trustee, if he has paid the debt out of his own funds, would be in advance to the

trust estate, and would be entitled to be re-imbursed out of it; in that event, it is admitted that the creditor may, if the trustee is insolvent, be allowed to take his place, and be paid out of the estate to the same extent; that the income of the estate is the fund for current expenses, and that the money in the hands of the trustee is that to which the creditor must look for payment. But before he can make the trust estate liable, he must show—

*First.* The necessity of the debt for the trust estate.

*Secondly.* That the trustee has no funds of the estate in his hands, or, as it is otherwise sometimes stated, the indebtedness of the trust estate to the trustee; and,

*Thirdly.* The trustee's insolvency. And, in support of this proposition, we are referred to *Guerry vs. Capers,* 1 *Bailey's Eq. Rep.* 159. *Manigault vs. Deas, Ibid,* 283. *Henshaw vs. Freer, Ibid,* 311. 3 *Dess. Eq. Rep.* 417, 418. 2 *Strobhart's Eq. Rep.* 235, 236. 2 *McCord's Ch. Rep.* 58.

I have endeavored to analyze these cases carefully. Some of them do not touch the main question involved in this discussion, namely: whether the *income* of the trust estate may not be bound for debts contracted for its benefit? and none of them deny directly the affirmative of this proposition.

But a new principle is attempted to be engrafted on this ancient doctrine; and that is, that where an executor or other trustee has received funds of the estate sufficient to pay the debt, and has failed to apply them to the purposes of the trust, or is in debt to the estate, that the creditor cannot go upon the estate for payment.

[3.] But it will be observed that these were all cases of *executors,* who are compelled to make annual returns, and whose accounts are open to public inspection. In this State, trustees—other than executors, administrators and guardians—have not been required to make returns of their actings and doings. It is impossible, therefore, for creditors, in the exercise of any degree of diligence, to ascertain the condition of the trust estate, or to know whether the disbursements have been made prudently or extravagantly, or whether the current expenses exceed

the current income or not. This constitutes a striking difference between the two classes of trustees.

But if this modern principle is to be understood as maintaining that, where the trustee, in this class of trusts, is in arrears to the trust estate, the creditor who has furnished articles for the use and benefit of the trust estate, and which are necessary and proper for it, is not entitled to payment, unless the trust estate is in debt to the trustee, so that the creditor may be subrogated to his rights—equity making that party responsible, at once, on whom the burden must ultimately fall, we are compelled to withhold from it our assent. We cannot subscribe to the proposition, that the equity of the creditor depends upon the fact of whether or not the trustee be in advance or in default to the trust estate. It rests, we suppose, upon an entirely different principle. Humanity to trust estates—the necessity of the case—forbid, in our judgment, the establishment of such a principle.

The trustee may be delinquent for thousands for past mismanagement; that, however, cannot deprive the trust estate of things necessary and proper for present subsistence. And suppose my agent has received and squandered my effects, are third persons to suffer on that account? It may constitute a very good reason why he should be removed, and a more faithful steward substituted in his place, but it cannot justify the withholding payment from the creditor who has fed and clothed me, and administered to my wants. It is a sufficient safeguard, that the *income* only of the trust estate can be charged, and that, too, for things *necessary* and *proper*. Here the *excess* only of the income, after the purposes of the trust have been fulfilled, is sought to be subjected. A decree more kind and considerate, for the protection of the trust estate, could not have been rendered. With such a check as this, there are few who would be willing to extend credit to trust estates. The careful and prudent man of business would be reluctant to run such a risk—much less involve himself in the onerous and ungracious task of sifting thoroughly the state of the accounts between the trustee and *cestui que trust* before he can venture to give credit. All this would be troublesome enough where annual returns are

made. In the absence of such means of information, I am at a loss to conjecture how such an examination could be possible.

[4.] But if I do not misapprehend the argument, it goes further still, and maintains that the trustee should *pay* as he *buys*. This position we believe to be wholly untenable. It is conceded that the creditor must look to the income, and that the income cannot be anticipated so as ultimately to encroach upon the capital. But we cannot admit that the creditor is restricted, for payment, to the income of the year during which the supplies were furnished. Flood and drought—excess of rain or want of it—and a thousand casualties might occur to reduce the income of any given year far below their most moderate expectations. In such a case, must the estate suffer, or the creditor be compelled to lose his money? And suppose that, under just such circumstances, the trustee, instead of economizing, should waste the income by lavishing it on luxuries or superfluities, is the merchant, mechanic and physician to go unpaid, who have contributed their goods, or work and labor, or skill to support and sustain the *cestui que trust* and trust property?

It is argued that the consequences would be monstrous, if the husband were to be permitted to charge, by his contracts, the separate estate of the wife.

[5.] A husband, if he is able, is bound to maintain his wife and children, notwithstanding they may have separate property; here he lacks the ability. Had Wylly lived, at the time this debt was contracted, apart from his wife, or had the trustees received notice from the wife, interdicting any application by the husband of the trust funds, or had the trustees given to the trust estate their personal supervision, or employed any other agent than the husband as manager, the case would have been different. *Aston vs. Aston*, 1 *Ves.* 267. *Riders vs. Lewis*, 1 *Atkyns*, 269. *Thrupp vs. Harman*, 3 *M. & K.* 516. 10 *Law Jour. N. S. Chanc.* 116.

What is there in this deed to prevent Mrs. Wylly from disposing as she pleased of the income arising from this property, and which was for her sole and separate use during her life? 1 *Ves.* 518. 14 *Ves.* 552. If, instead of suffering it to accumulate, she

preferred to employ it in a more expensive way of living, is there any law or authority to forbid it? And would it not be presumed, even if the fact had not been found, that these disbursements made by the husband were by the direction and consent of the wife. 2 *P. Wms.* 82.   4 *Bro. C. C.* 326.   8 *Bligh, N. P.* 224, 246.   *S. C.* 4 *Sim.* 588.   2 *Cl. & Fin.* 665.

[6.] But I will not stop to consider the *status* of a *feme covert* in respect to her separate estate. Whatever may have been the Common Law rule upon this subject, it is now settled, so far as authority can settle any point, that, with respect to her separate property, a married woman is to be regarded, in Equity, as a *feme sole.* And, in many of the cases, the Courts have gone to the extent of holding that, notwithstanding any particular mode of disposition be specifically pointed out in the instrument, yet it does not preclude her from adopting any other mode, unless there are negative words restraining her power to the very mode designated.   4 *Barbour*, 553.   17 *Johns.* 548.   22 *Wend.* 528.   2 *Story's Eq. Jur.* §§1397 *to* 1401.   1 *Craig & Phil.* 48.   7 *Paige*, 14.   *Ibid*, 112.   10 *Paige*, 346.   11 *Paige*, 475.

This Court has not felt at liberty to depart from the doctrine held by Chancellor *Kent*, in the case of the *Metho. Epis. Church vs. Jaques*, (3 *Johns. Ch. Rep.* 77,) namely: that a *feme covert*, with respect to her separate property, is to be considered as a *feme sole* to the extent only of the power given to her by the deed of settlement; her power of disposition being not absolute, but *sub modo*, to be exercised according to the mode prescribed in the deed or will under which she becomes entitled to the property.

[7.] By the Common Law and by the Bible, which is the foundation of the Common Law, the union of man and wife was a junction of persons and fortunes—"no more twain, but one flesh." But this link which bound them in one bond, for better and for worse, has been broken, and, in the progress of civilization, a new principle has been introduced from the Roman Law, viewing husband and wife as distinct persons, with distinct property and distinct powers over it. Time will test the propriety of this innovation.   3 *Dess.* 417.

[8.] But I pass on, remarking that it is not pretended that

Wylly acted in this case in the character of husband merely, but in the capacity of agent for the trustees. By the deed, they were authorized to appoint some fit and proper person to manage the property and make it productive for the objects of the trust. Could any one more suitable have been selected than the husband and father of the *cestui que trusts*? We have endeavored to show, upon general principles of equity, that even if Wylly had mismanaged the estate, the defendants in error are not responsible for it; and that if loss must ensue to one of the par·ties, that they should not suffer for having given credit to this authorized agent. But the record really discloses no mismanagement, at least no waste of the income by Wylly. His insolvency does not prove it, neither does the fact that there are outstanding debts unpaid and menacing the trust estate. All this may have been the result of misfortune, or of circumstances beyond his control.

[9.] That these creditors had a right to trade and treat with Wylly as agent, we think abundantly shown by the testimony. True, the trustees may not have intended to depute to him express authority; but the question is not what power they designed to give, but what power third persons who dealt with him had a right to infer he possessed? Strangers can only look to the *acts* of the parties, and not to any private understanding that may exist between them; and if a person permit another to assume the apparent right of disposing of property in the ordinary course of business, it must be presumed that the apparent authority is the real authority. When the principal has been informed of what has been done, he must dissent and give notice of it within a reasonable time, and if he does not, his assent and ratification will be presumed. *Dunlap's Paley,* 172, *note.* 2 *Kent's Comm.* 616. 1 *Liv. Pr. and Ag.* 396. *Benedict vs. Smith,* 10 *Paige,* 127.

Could the authority, assumed and exercised for fifteen years over this trust estate by Wylly, have escaped the notice of the trustees, residing as they did in the same County? Yet they never, during all that time, complained or repudiated his acts. Third persons had a right to infer that they assented to, and would ratify his purchases for the trust estate.

2. This brings us to the consideration of the second question presented for the decision of the Court.   If the complainants in the bill had a right to proceed against the trust estate, have their rights been lost by any acts of commission or omission on their part?   It is argued, on the other side, that they have been lost, both by acts of commission and omission—

1st. By having given credit to Alexander W. Wylly, and then taking his note for the account.

2d. They are barred by the Statute of Limitations.

We will examine each of these two grounds of defence.

[10.] 1st. Did the fact that the goods were charged to Wylly, and his note taken for the same, discharge the trust estate from all liability?

If an agent buy in his own name, without disclosing his principal, and the seller subsequently discover that the purchase was, in fact, made for another, he may, at his choice, look for payment either to the agent or the principal—and that too, notwithstanding the title has been made to the agent, and he debited with the account—to the agent upon his personal contract—to the principal upon the contract of his agent.   On the other hand, if, at the time of the sale, the seller knows not only the person, who is nominally dealing with him, is not principal, but agent, and also knows who the principal really is, and notwithstanding all the knowledge, chooses to make the agent his debtor—dealing with him and him alone—the seller must be taken to have abandoned his recourse against the principal, and cannot afterwards, upon the failure of the agent, turn round and charge the principal, having once made his election at the time when he had the power of choosing between the one and the other.   *Nelson vs. Powell*, 3 *Dougl.* 410, *and note by Mr. Roscoe, the editor, ibid. Addison vs. Sandaxqui*, 4 *Taunt.* 574.   *Patterson vs. Sandaxqui*, 15 *East.* 62.   *Thomson vs. Davenport*, 9 *B. & C.* 78.   *Freeman vs. Andrews*, 4 *Wash. C. C. Rep.* 567.

An election deliberately made, with knowledge of facts and absence of fraud, is conclusive; and the party who has once elected, can claim no right to make a second choice, and there

is no difference in this respect between the rules pursued by Courts of Law and Equity. *Dunlap's Paley,* 249, *note.*

Does the evidence in this case establish such an election on the part of the creditor to look alone to Alexander W. Wylly for payment, as to preclude him from going against the trust estate ? We have seen that the bare circumstance of having charged the goods to him on his books, does not constitute such an election ; neither does the taking of the note *in liquidation* of the account.

[11.] One simple contract does not merge or extinguish another. 11 *Mass. Rep.* 359, 361. A check at two months, given for goods sold, was held to be no payment—it never having been accepted. 1 *Esp. Rep.* 5. 2 *Bos. & Pull.* 518, 524. A promissory note no bar to an action upon a simple contract. 1 *Burr.* 9. 1 *Bla. Rep.* 65. Unless the defendant agreed to take the note in payment and run the risk, it is no payment. 7 *T. Rep.* 64, 66. Ch. Justice *Marshall,* in *Shehe vs. Mandeville,* said, it is not denied that a note, without a special contract, would not, of itself, discharge the original cause of action—it is otherwise by the agreement of the parties. 6 *Cranch,* 253, 264.

[12.] Indeed, the general rule is now well settled, that a note, bill, acceptance or promissory note, either of the debtor or of a third person, is no payment or extinguishment of the original demand, unless it is expressly agreed to receive it as payment. *Porter vs. Talcott,* 1 *Cowen,* 359, 383. *Harris vs. Johnston,* 3 *Cranch,* 318. *Tobey vs. Barber,* 5 *Johns. Rep.* 68. *Schemerhorn vs. Lonies,* 7 *Johns. Rep.* 311. *Johnson vs. Weed,* 9 *Johns. Rep.* 309. *Muldon vs. Whitlock,* 1 *Cowen,* 290. *Porter vs. Talcott, Ibid.* 359. *Whitbeck vs. Van Ness,* 11 *Johns. Rep.* 409. *Carlies vs. Cummins,* 6 *Cowen,* 181. *Van Ostrand vs. Reed,* 1 *Wend.* 424. *Watrous, ex'r, vs. McLaren,* 19 *Wend.* 567. *Brown vs. Jackson,* 1 *Wash. C. C. Rep.* 516. *Parker vs. The United States,* Peters' *C. C. Rep.* 462. *The United States vs. Lymen,* 1 *Mason,* 482. *Hays vs. Stone,* 7 *Hill,* 128. *Hughs vs. Wheeler,* 8 *Cowen,* 77. *Frisbie vs. Larnea,* 21 *Wend.* 450. *Cole vs. Sackett,* 1 *Hill,* 516. *James vs. Williams,* 13 *Mees. & Wels.* 828.

[13.] The circumstance, that the note or bill was given by the agent of the principal debtor, cannot vary the question. 1 *Liv.*

*Pr. and Ag.* 207. *Dunlap's Paley,* 247, *note* 3. If the vendor, on a sale made to an agent, take the promissory note of the agent for the amount of the purchase, on failure of payment by the agent, the principal would be equally liable to an action by the vendor, founded upon the original consideration, as if the note had been given by the principal himself. *Ibid.*

[14.] If neither the written promise of the debtor nor the promissory note of a third person be deemed payment, so as to extinguish the debt, and confine the creditor to his remedy under the written instrument, unless accepted as such at the time of the sale—*a fortiori*—the note of the agent can have no higher efficacy to discharge the principal, than if made by the principal himself. *Ibid.* See, also, authorities cited on the main proposition. In the absence of all proof, then, as to whether or not the complainants intended to exonerate the defendants, the presumption would be that they did not. To screen the trust estate, it should have been shown that Wylly's note was taken as payment, and that the creditor agreed to run the risk of its collection.

But so far from having elected to look alone to the agent, there is some evidence directly the other way. I do not refer to the notorious insolvency of Wylly, but to the promise which he made, that he would pay for the articles bought out of the crops made by the trust property. The credit was given to Wylly, it would seem, on the pledge and faith of the trust estate. But the election of the agent must be to the exclusion of the principal, or the doctrine, on which this portion of the argument rests, does not apply. The creditor, as he should have done—I do not say he was bound to do it—has looked, in the first instance, to Wylly, and, having prosecuted him to insolvency, he now comes into Equity and seeks to make the principal liable to the extent merely of subjecting the surplus income, after defraying the necessary expenses of the family, to the payment of his debt. Is not this reasonable? Is it not right? If the debt be honest, and the debtor able, of his abundance, and without defeating the ulterior objects of the trust, to pay, should Chancery not compel it? Suppose the income of past years was wasted, is that

any answer why the income of future years should not be thus applied? Where one of two innocent persons must suffer by the misconduct of a third, that party should suffer, who, by his own acts and conduct, has enabled such third person, by giving him credit, to perpetrate a fraud or practise an imposition upon the other party. And although the principal puts funds in the hands of his agent, yet, if he pay not the creditor, the principal must stand liable. This is the highest equity—the highest morality. *Speering vs. Degrave,* 2 *Vern.* 643. *Kymar vs. Swercropp,* 1 *Campb.* 109.

[15.] 2d. The last ground taken by counsel is, that the claim is barred by the Statute of Limitations.

The claims which are barred in Equity, are only such as the party coming into a Court of Equity had also a right at Common Law. The Statute never applies to a purely equitable claim where there is no remedy at Common Law. In such cases the Courts will not allow the Statute to be avoided by a change of the forum. A claim, for instance, against the trust estate of a married woman, being purely equitable, is never barred by the Statute. 2 *Dan. Ch. Pr.* 732. 2 *P. Wms.* 144. 7 *Johns. Ch. Rep.* 116.

In *Bond vs. Hopkins,* (1 *Sch. & Lef.* 428,) Lord *Redesdale* said, " The Statute of Limitations does not apply, in terms, to proceedings in Courts of Equity. It applies to particular actions at Common Law, and limits the time within which they shall be brought, according to the nature of these actions; but it does not say there shall be no recovery in any other mode of proceeding. Nothing is better established in Courts of Equity, than that where a title exists in conscience, though there be none at Law, relief should, though in a different mode, be given in Equity. But it is said that the bar, arising from lapse of time, ought not to be removed. Why not as well as a satisfied term, if used against conscience? But it is contended that the bar, arising from the Statute of Limitations, ought not to be removed, because the enactment of the Statute is positive. The answer is, the positive enactment has nothing to do with the case. The question is, not whether it shall operate in a case, provided for

by the positive enactment of the Statute, but whether it shall operate in a case not provided for by the words of the Act, and to which the Act can only apply, so far as it governs decisions in the Courts of Equity—that is, whether it shall prevent a Court of Equity from doing justice, according to good conscience, where the equitable title is not barred by the lapse of time, although the legal title is so barred."

In regard to equitable titles, Courts of Equity are to be considered as affected only by analogy to the Statute of Limitations. If the party be guilty of such *laches* in pursuing his equitable title as would bar him—if his title was solely at Law—he shall be barred in Equity; but that is all the operation it has or ought to have in proceedings in Equity. *Per Dunkin, Chancellor, in Smith vs. Smith,* 1 McMullan's *Eq. Rep.* 126.

Now, the statutory bar in this case had not attached at law, as between the original parties. Wylly gave his note in settlement of the store account in January, 1841. The judgment was obtained against him in December, 1842. A partial payment was made by the defendant in 1844, and a return of "*no property*" was indorsed on the execution in 1848, within less than seven years of the date of the judgment. The Statute of Limitations being admitted in a Court of Equity, by analogy only, and the Common Law right against Wylly never having been lost from the creation of the debt to the filing of the bill, and Wylly being the agent only of the trustees and *cestui que trusts,* would it not be singular to hold, that the creditor had lost his equitable rights against the trust estate? But, to our minds, the most satisfactory answer to be made to the Statute of Limitations is, that it never commenced running against the equitable claim, which the complainants in the Court below had against this trust estate, until their legal remedy against Alexander W. Wylly had been exhausted, and had proved ineffectual for the recovery of their debt.

The course pursued in this case, was that which was followed in all the precedents which have been cited. It is the most advantageous and just to the trust estate. The process of law has been exhausted in obtaining redress of the party previously defined

and we are inclined to think that, ordinarily, a Court of Equity should not take cognizance of a cause of this sort, until the right of the creditor, and the insolvency of the debtor, have been first ascertained in this way. Certainly, in all cases, it is the most satisfactory mode, and in some, perhaps, the only way in which these facts could be fully established. 1 *Bailey*, 311.

At any rate, equity will acquit this creditor of being guilty of such *laches* as will deprive him of the relief which he seeks.

We are accordingly of the opinion, that the merits of this case, upon the law, are with the defendants in error. I cannot dismiss it, however, without acknowledging my indebtedness to all the counsel concerned, for the masterly manner in which it has been argued, and my particular obligations to my brother *Ward*, for his model *brief*, which has been of essential service to me in preparing this opinion for publication, after an interval of more than two months since its delivery.